I iSTEWART, Judge.
The defendant, D.L.S.; appeals this adjudication by the Juvenile Court, Parish of Cad-do. The defendant was adjudicated a delinquent for the aggravated rape of R.T., an 11-year-old girl, a violation of La. R.S. 14:42. The court ordered him committed to the custody of the Department of Public Safety and Corrections until his twenty-first birthday. For the following reasons, we affirm.

FACTS

The victim, R.T., testified at trial that she had known defendant for about a year. Defendant and another boy, L.B., visited the victim’s house on the afternoon of November 5,1996, while the victim’s parents were away from home. She initially thought the boys had come to her house to buy “freeze cups.” When the boys arrived, the victim was talking on the telephone to a friend, C.B., and told C.B. that she would call back later. The victim testified that defendant picked her up and carried her to her sister’s room.
Defendant first had intercourse with the victim, and then L.B. had intercourse with the victim, both on her sister’s bed. The victim attempted to resist defendant, telling him to stop and scratching him. She also asked L.B. to stop, but he did not. The intercourse caused her to bleed leaving stains on the bed. The victim attempted to wipe the stains from the bed with a towel. When she later discovered blood on her underwear, she placed the underwear in the bathroom with other dirty clothes. Afterwards, the victim called a friend and told her what had happened. She later told her mother.
The victim’s mother testified that on November 5, 1996, she arrived at her home at approximately 2:30 p.m. and noticed several children outside. When the victim’s mother entered the house, she noticed that the cable television wire had been torn and scolded the victim for failing to do her chores.
|2Near 5:00 that afternoon, the victim told her mother something had happened to her. After finding bloody underwear in the bathroom and bloody sheets in her oldest daughter’s room, the victim’s mother called the police.
Shreveport Police Detective Kyle Tanner took a statement from defendant on November 7, 1996: A recording of this interview with defendant was admitted into evidence. In this interview, defendant admitted having vaginal intercourse -with the victim, but insisted that the victim willingly allowed him to have sex with hex’.
*189 The victim’s friend, C.B., testified that, on the date in question, the victim called her, told her she was “fixing to handle her business,” an apparent reference to sex, and would call C.B. back later. C.B. testified that the victim did call back but did not mention what had happened.
Mary Hall, the victim’s neighbor, testified that she saw defendant enter the victim’s house on the date in question with his brother, A.S., and another boy, L.B. She observed the boys enter the house once, apparently to buy freeze cups, and then saw them return later. She testified that defendant’s brother left the house first and that later defendant and L.B. left the house together. Ms. Hall and her sister told the victim’s father that the boys had been coming in and out of the house. Mario, Ms. Hall’s sister, also testified that she saw the boys enter the victim’s house.
Dr. Ann Springer, a pediatrician at LSU Medical Center, was accepted as an expert in the field of examination of children for sexual abuse. On December 2, 1996, Dr. Springer performed a specialized examination of the victim for documentation of possible damage to the hymen. Dr. Springer’s examination revealed signs of sexual molestation with penetration.
13Corporal John Youngblood of the Shreveport Police Department was dispatched to the victim’s address after the rape was reported and was the first officer on the scene. Corporal Youngblood testified that the victim stated that she had been raped by A.S. and L.B. He detected no signs of struggle or forced entry in the house.
The victim again testified that she had told Corporal Youngblood she had been raped by L.B. and defendant, not defendant’s brother. The victim’s mother testified that, although she did not hear the conversation between the victim and Corporal Youngblood, her daughter had never claimed that anyone other than defendant and L.B. had raped her on November 5,1996.
The court found that defendant had committed aggravated rape and adjudicated defendant a delinquent. After a disposition hearing, the court ordered that defendant be committed to the custody of the Department of Public Safety and Corrections until his twenty-first birthday.

DISCUSSION

Assignment of Error Number 1: Motion to Suppress

Defendant filed a motion to suppress the tape-recorded statement admitted into evidence. Shreveport Police Detective Kyle Tanner testified at the hearing on the motion to suppress that he obtained a statement, on November 7,1996, from defendant in connection with the incident. Defendant first appeared at his office with his older and younger brothers. The three left and returned shortly thereafter with their mother.
Detective Tanner gathered information regarding defendant and his mother before taking defendant’s statement. He determined that defendant, a 14-year-old male, had completed the seventh grade. Defendant’s 38-year-old mother had | completed the eleventh grade. After gathering this information, Detective Tanner read defendant his rights and allowed defendant and his mother time to discuss whether they should give a statement. Detective Tanner explained to defendant that he was being investigated regarding an alleged aggravated rape. The rights form read to defendant indicated that he had the right to remain silent, that anything he said could and would be used against him, that he had the right to talk to a lawyer for advice during questioning and that he had the right to have a lawyer with him during questioning. Defendant was informed that a lawyer would be appointed to represent him, if he could not afford one. Detective Tanner further informed defendant that, if he began answering questions without a lawyer present, he had the right to stop the interview at any time to be advised by an attorney or for any other reason. At that time, Detective Tanner and the other detective present left the room.
Only three or four minutes had elapsed when defendant and his mother opened the door and allowed the detectives to reenter the room. Detective Tanner testified that defendant and his mother would have been *190 allowed as much time- as they wanted to make a decision.
Detective Tanner testified that defendant’s mother indicated that she understood defendant’s rights regarding his being questioned. She said she understood that anything defendant said could be used against him and that he had the right to refuse to answer questions. She also understood that defendant had the right to have an attorney appointed to represent him without cost. Detective Tanner marked the rights form to indicate her responses, and both he and defendant’s mother signed the form.
IgDefendant stated to Detective Tanner that he had discussed with his mother his right to remain silent, his right to refuse to answer questions and the fact that anything he said could and would be used against him. Defendant acknowledged that he had discussed with his mother his right to have a lawyer present and to have a lawyer appointed without cost to him. He stated that he understood his rights and was willing to answer questions without having a lawyer present. In response to questioning, defendant stated that no threats or promises had been made to him and that no pressure of any kind been used to persuade him to answer questions or to waive any of his rights. Detective Tanner marked the form to indicate defendant’s responses, and both he and defendant signed the form.
Detective Tanner testified that at any. time, defendant and his mother could have received additional time to discuss the matter further. He stated that neither defendant nor his mother indicated any reluctance on their part to give a statement. Detective Tanner did not offer or promise anything to defendant or his mother in exchange for a statement. He testified that he made no threats to them, placed them under no duress, did not coerce them and made no concessions of any kind to them in' return for a statement. Detective Tanner testified that he considered defendant’s statement to be free and voluntary and that he would not have accepted the statement had he not so considered it.
Defendant’s mother testified that Detective Tanner had accurately described what had happened before and during the interview. She agreed that defendant’s statement was free and voluntary.
The court denied the motion to suppress. Defendant assigns this ruling as error.
| (¡In order for the state to meet its heavy burden of demonstrating that a waiver is made knowingly and intelligently, it must affirmatively show that the juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian, or other adult interested in his welfare before he waived his right to counsel and privilege against self-incrimination. State in Interest of Dino, 359 So.2d 586, 594 (La.1978), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978). A purported waiver by a juvenile must be adjudged ineffective upon the failure by the state to establish any of three prerequisites to waiver, i.e., that the juvenile actually consulted with an attorney or an adult before waiver, that the attorney or adult consulted was iriterested in the welfare of the juvenile, or that, if an adult other than an attorney was consulted, the adult was fully advised of the rights of the juvenile. Id.
Apart from the additional requirements imposed by Dino, the voluntariness of a juvenile’s confession or inculpatory statement, as in the case of an adult’s statements, is to be judged by a totality of the circumstances test. State v. Kent, 371 So.2d 1319, 1320 (La.1979). The court determining admissibility must consider whether the defendant was aware not only of his rights, but also of the consequences of foregoing them, knew he was faced with a phase of the adversary system, and was aware that he was not in the presence of persons acting solely in his interest. Id.
Defendant contends he was “not advised of the full import of the statements he was making” because “he was not even aware that he was a suspect to a crime.” However, Detective Tanner specifically testified that he had explained to defendant and his mother that he wanted to question defendant “about an aggravated rape which was the charge I was questioning them about.” Detective hTanner also testified that he explained to *191 defendant that he was considered a suspect. Thus, defendant and his mother were aware that the police wished to question defendant about a crime.
Defendant argues he was not made aware of the consequences of waiving his right to have counsel present when making a statement or refusing to answer questions.' However, Detective Tanner testified that he informed defendant of his right to a lawyer and his right to remain silent and that he also informed defendant that anything he said could and would be used against him. Defendant and his mother were thereby made aware of the consequences of waiving the right to counsel.
Defendant argues that he was not made aware of the fact that his statement was made in the presence of persons not acting in his interest. See Kent, supra. However, defendant was interviewed at Detective Tanner’s office in the presence of another detective. Defendant and his mother were informed of his constitutional rights. Defendant was also informed that anything he said could and would be used against him. The totality of the circumstances shows that defendant was aware that he was not in the presence of persons acting solely in his interest. Kent, 371 So.2d at 1320. Cf. State v. Hudson, 404 So.2d 460, 464 & n. 6 (La.1981).
Defense counsel argues that defendant was 14 years old and had a seventh grade education, had no previous encounters with law enforcement and supposedly “was not even aware that he had committed a crime.” Defendant’s attorney also argues that, because defendant had never before been read his Miranda[1] rights, “he did not fully appreciate the consequences of foregoing his rights.” However, | «testimony at the disposition hearing showed that defendant had in fact been arrested before as the result of a fight, though there is no indication of whether defendant had been read his Miranda rights at that time. More importantly, the record supports the conclusion that, after the police fully complied with Dino, defendant did in fact comprehend the consequences of giving a statement to the authorities. This assignment is without merit.

Assignment of Error Number 2: Excessive Disposition

Gary Hodel, a Caddo Parish Juvenile Court probation officer, prepared a predisposition report for defendant. At the deposition hearing, Mr. Hodel testified that defendant’s mother denied any history of psychological or psychiatric treatment for defendant but that he subsequently learned from defendant’s father that defendant had undergone psychiatric treatment, receiving inpatient treatment in 1995. Defendant’s mother later told Mr. Hodel that she had forgotten to mention the treatment.
Mr. Hodel testified that defendant had denied being involved in gang activity. Nonetheless, Mr. Hodel’s report stated that defendant had been involved in a “gang fight” in September, 1996. As a result of this fight, defendant was arrested.
The victim’s father testified that he believed neither defendant nor his brother had respect for older people. He stated that they “like to wear their pants down” and that he thought they were gang members. The .victim’s father testified that, on the day of the incident in question, he went to defendant’s mother’s house. When he arrived, defendant stood near the home and said to him, “I will kill your mother fucking ass.” The victim’s father testified that the police were present atjgthe time. He further testified that defendant stared at him during court as if he were trying to scare him.
The victim’s father testified that, after the rape, he and the victim’s mother visited a psychiatrist and a rape crisis center. He testified that, when he tried to comfort his daughter, the victim did not want him to touch her.
The victim’s mother testified that the aftermath of her daughter’s rape , had been a “nightmare” which had affected the family emotionally and financially. She testified that her daughter had received Prozac and Valium in the course of her treatment and that the victim had taken AIDS and pregnancy tests. The victim’s mother further testi- *192 fíed that defendant’s brother began pursuing the victim when she was only nine years old.
R.T., the victim, testified at the hearing. She admitted that she had sex with defendant’s brother, A.S., on October 31, 1996. After they began having intercourse, she asked him to stop. At first, he refused. When he did stop, he called her a “child bitch.” The victim was then raped by defendant and L.B. on November 5, 1996. She testified that she did not agree to have sex with defendant.
Defendant presented witnesses at the hearing as well. Bobby Joe Cooper, a Caddo Parish school bus driver, testified that he saw defendant on an almost-daily basis for two years. Mr. Cooper testified that defendant played basketball on a basketball goal he had built in' the community, and sometimes went to church with him. However, he knew defendant’s brother better than he knew defendant.
Michael Williams, a Caddo Parish Commissioner, testified that he knew defendant very well and that defendant had been active in Williams’ campaign for public office. He testified that defendant handed out leaflets door to door during the campaign. Mr. Williams stated that he had eaten lunch and dinner with | ^defendant and his brother on several occasions. He considered them “very good young men, children.” ' He testified that he saw defendant about once every two weeks. He testified that defendant was “an upstanding young man in the community.” Mr. Williams testified that he did not think defendant knew, at the time of the incident, that it was wrong to have sex with an 11-year-old girl. He offered the opinion that, in view of defendant’s previous mental problems, it would be a waste of money to incarcerate defendant for the full term prescribed by law.
Melvin Hall, an 83-year-old retiree, testified that he lived near defendant and saw him almost every day. Defendant had gone to church with Mr. Hall on several occasions. Mr. Hall considered defendant to be a “fine young man.”
Defendant’s father testified at the hearing. Although he did not live with the boys and their mother, he provided financial support by paying the bills for them due to defendant’s mother unemployment. He testified that defendant spent weekends with him and went to church with him. He testified that he had visited defendant when he was hospitalized for psychiatric treatment and denied that defendant was involved in gang activity.
Defendant’s father admitted that defendant and his brother were both involved in a fight and suspended from school 1994. He also admitted that on a separate occasion the parents of another child had gone to the school to complain that defendant and his brother had bullied and threatened their child at school. Defendant’s father testified that defendant was sorry for what he had done to the victim. He also testified' that defendant claimed that the victim called defendant and his brother to her house to have sex with them.
Robert Raphael, an employee of the Caddo Juvenile Detention Center, testified that he had observed defendant since he had been detained in November, Inl996. He testified that defendant had been a “great influence” on the other juveniles and a model resident in the detention center.
Defendant also testified at the hearing and stated that he would like to play sports and finish school. He claimed that the victim permitted him to enter her house and that he overheard the victim tell a friend on the telephone that she was “fixing to handle her business,” a phrase which meant she was about to have sex with defendant He testified that she willingly allowed him to have sex with her. He testified that what he did was wrong and that he was sorry for it. Defendant further admitted that he knew the victim was in the sixth grade.
The court committed defendant to the custody of the Department of Public Safety and Corrections for assignment to a secure facility until his twenty-first birthday. See La. R.S. 14:42 C; La. Ch. C. art. 897.1 A. Defendant argues that the disposition imposed was unconstitutionally excessive.
The juvenile court should impose the least restrictive disposition which is consistent with the circumstances of the case, *193 the needs of the child, and the best interest of society. La. Ch. C. art. 901 B. A juvenile has the same constitutional rights against excessive punishment as an adult. State, in Interest of T.L.R., 513 So.2d 554, 555 (La. App.2d Cir.1987). In any review for exces-siveness, the appellate court must first ascertain whether the lower tribunal took cognizance of the La. Ch. C. art. 901 B criteria and whether the record reflects an adequate factual basis for the commitment imposed. State in Interest of T.L., 28,564, p. 2 (La.App.2d Cir. 5/8/96), 674 So.2d 1122, 1124. Following that determination, the reviewing court need only explore for constitutional excessiveness in light of the circumstances of the ease and the background of the juvenile. Id. Absent a showing of manifest abuse of the wide discretion afforded in such eases, a I ígdisposition will not be set aside as constitutionally excessive. Id.; State in Interest of J.D.J., 27,673 (La.App.2d Cir. 9/27/95), 661 So.2d 519.
The disposition in this case is not unconstitutionally excessive. Defendant was 14 years old when he had intercourse with R.T., an 11-year-old child. Defendant has heavily relied on the claim that the victim “consented” to the intercourse, though she denied this claim. However, as defendant admits, the aggravated rape statute deems intercourse with a child under the age of 12 years to be without lawful consent. La. R.S. 14:42 A(4). The victim’s father testified that defendant threatened to kill him on the day defendant raped his daughter. Defendant had experienced disciplinary problems in school and had been hospitalized for behavioral problems. Clearly, defendant is in need of a custodial environment. The record reflects an adequate factual basis for the imposition of this sentence. State in Interest of T.L., supra. The imposition of the term of confinement mandáted by law is not an abuse of discretion. Id. See also State in Interest of Johnson, 461 So.2d 551, 556 (La.App. 3d Cir.1984). This assignment of error is without merit.

CONCLUSION

The police adequately complied with Dino, and the trial court properly admitted defendant’s confession. The punishment mandated by law is not unconstitutionally excessive in this case. For the foregoing reasons, we affirm.
AFFIRMED.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).