EDWIN A. LOMBARD, Judge.
_jjThe juvenile, R.A., appeals his adjudication as a delinquent, challenging the sufficiency of the evidence to support two counts of sexual battery. After review of the record in fight of the applicable law and arguments of the parties, the judgment of the juvenile court is affirmed.

Relevant Facts and Procedural History

In October 2006, K.T. informed her mother that several years earlier she had been sexually abused by her cousin, R.A. In January 2007, R.A. was arrested for indecent behavior with a juvenile and the following month charged with two counts of sexual battery, a violation of La.Rev. Stat. 14:43.1. By amended petition, the State alleged that the charged offenses occurred between March 2004, and March 2005. After the hearing on August 5, 2010, R.A. was adjudicated a delinquent on both counts. Following a disposition hearing on November 15, 2010, the juvenile court ordered that R.A. be remanded to the custody of the Department of Corrections until his 21st birthday and that he receive sexual perpetrator counseling while in secure care,
. The íuvenile now appeals both the adju- •* , dication and the disposition.
| ^Applicable Law and Standard of Review
The State’s burden of proof is the same in a juvenile adjudication proceeding as in a criminal proceeding, ie., the State must prove every element of the alleged offence beyond a reasonable doubt. La. Ch.Code art. 883. We review a sufficiency of the evidence challenge under the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and, accordingly, must determine “whether the evidence, viewed in the fight most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984) (citation omitted). “[A]n appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong” and “[w]here there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court.” In re A.J.F., 2000-0948 (La.6/30/00), 764 So.2d 47, 61. Accordingly, if the factual findings “are reasonable in fight of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, where there are two permissible views of the evidence, the fact finder’s choice cannot be clearly wrong and an appellate court may *960 not substitute its opinion for that of the juvenile court judge “who is in the unique position to see and hear the witnesses as they testify.” In re A.J.F., 764 So.2d at 62. Thus, absent internal contradiction or irreconcilable conflict with physical evidence, even a single witness’s testimony is | ^sufficient to support a factual conclusion. State v. Robinson, 874 So.2d 66 (La.2004).
La.Rev.Stat. 14:43.1 provides in pertinent part:
A. Sexual battery is the intentional engaging in any of the following acts with another person where the offender acts without the consent of the victim, or where the act is consensual but the other person, who is not the spouse of the offender, has not yet attained fifteen years of age and is at least three years younger than the offender:
(1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, (emphasis added).

Discussion

The following evidence was adduced at trial.
Raymond Ambrose, III, of the child abuse unit of the New Orleans Police Department (NOPD) testified that he first interviewed K.T. and her mother, Lashon-da Anderson, on October 5, 2006, and, based upon that interview, arrested the juvenile for indecent behavior with a juvenile.
Ms. Anderson testified that she is the mother of K.T. (the victim) and the cousin of R.A. (the juvenile). During the pertinent period, March 2004 through March 2005, her daughter regularly visited at the homes of Ms. Anderson’s mother’s sisters (and Ms. Anderson’s aunts), Mary Samuels and Delores Jackson (a/k/a DeeDee), for family events, and card games. Because Ms. Anderson worked, she was often absent from these family visits. In October 2006, based on information related to her in a letter from K.T., Ms. Anderson took her daughter to |4the police and to Children’s Hospital where she was interviewed by Patricia Percy, a licensed clinical social worker.
Ms. Percy testified that she conducted a videotaped forensic interview with K.T. at the Children’s Advocacy Center (CAC). The videotape of the CAC interview was played for the court. According to the transcript of the interview submitted by the State,[1] the victim stated that when she was about seven she accompanied her grandmother to family card parties. On two separate occasions, once at her Auntie Mary’s house and once at Auntie DeeDee’s house, she was alone in a room with her cousin, R.A. On both occasions, R.A. got on top of her with her pants down and “moved back and forth.” In addition, on the second occasion he asked her “to squeeze his private or hold it.” When asked if he touched her, she replied that he touched her skin. Then the following colloquy occurred:
Q: Okay. Do you remember what he touched you with on your skin?
A: Not really. But I do think I felt something slimy.
*961 Q: You felt something slimy?
A: Yes.
Q: Okay. And um where did you feel or see that? On the outside of your legs or?
A: Down here I think.
Q: More on your private parts?
A: uh huh.
[[Image here]]
IsQ: Okay. All right [sic]. Um well did he hurt you at all?
A: Well he did hurt me when he was on top of me.
Q: Okay. Do you know if he put anything inside of your body?
A: I don’t know.
Q: Did it feel like anything was um hurting you?
A: I don’t think so.
Q: Or anything? Or poking you?
A: I don’t really think so.
Notably, when asked by Ms. Percy if she could use dolls to show her what happened, K.T. replied, “Not really.” Likewise, when asked by Ms. Percy if she could tell her (in relation to pictures) “what kids call different body parts,” K.T. replied, “Not really.”
In response to questioning by the court, Ms. Percy opined that the victim’s statement was reliable.
K.T., born on March 5, 1997, and thirteen years old at the time of adjudication hearing, testified that when she was younger she had often accompanied her grandmother to the home of her cousin, R.A. (who she identified in court) and her “Auntie Mary.” On one occasion when she was “[m]aybe, eight years old,” she was R.A.’s room watching television and he asked her to pull her pants and underwear down. She complied and, after pulling his own pants and underwear down, he got on top of her and began moving back and forth. He quickly got off her when Auntie Mary opened the door of his room and walked in, asking what they were doing.
| fiK.T. testified that the second incident occurred at the home of “Auntie DeeDee” when she accompanied her grandmother there for “another card game.” Again, while the adults were downstairs in the living room, K.T. was alone with R.A. in an upstairs bedroom. He again asked her to pull her pants down and got on top of her, stopping only when her cousin Courtney walked in the room.
K.T. related that two years after the second incident, she wrote a letter to her mother. The letter, which was submitted into evidence, states in pertinent part:
... One day when I was seven years old, I went with maw maw to a card game at Auntie Mary’s house, and little [R.A.], not big [R.A.], touched me in bad places. I thought it was okay because we were cousins. But when you picked us up, it didn’t feel right. And you don’t know how scared I was. And last week it started to haunt me, and it kept popping up in my mind. It’s hard to explain how he touched me....
On cross-examination, K.T. conceded that both times when someone walked into the room her pants and underwear were on “but pretty messy and her pants were unzipped and belt undone.”
Mary Samuels, KT.’s aunt and R.A.’s grandmother and legal guardian, testified that her relationship with the KT.’s mother ended when “they accused [R.A.] of something he did not do.” She conceded that she often hosted family card parties at her house and that children, including K.T., were often brought to these gatherings. According to Ms. Samuels, the visiting children would stay in the back of the house in her grandson’s room and she constantly walked back and forth to check *962 on the children. Ms. Samuels insisted that K.T. was never alone with R.A. in his room because other children were always present, the bedroom door was never closed, and she “checked on them all the time.” Ms. Samuels conceded that R.A. sometimes accompanied her to card games at her sister’s house (the location of the second incident) and that K.T. was sometimes there, but insisted 17that the doors leading upstairs in her sister’s house were always locked and the children stayed downstairs. She insisted that R.A. and K.T. were never alone at either house.
Delores Jackson testified that she was Mary Samuels’ sister and that R.A. and K.T. were, respectively, her nephew and niece. She stated that during the card games at her house, the children (including R.A. and K.T.) stayed in the next room and could not go upstairs because the bedroom doors were always locked when anyone was there. She insisted that the R.A. and K.T. were never the only children at her house and that K.T. was always with her grandmother. Ms. Jackson testified that when the card games were at Ms. Samuel’s house, the door to the juvenile’s bedroom was never closed and “the grownups” were constantly checking on the children in R.A.’s room. On cross-examination, contrary to Ms. Samuel’s testimony that she never played cards at her own house, Ms. Jackson stated that Ms. Samuel’s “sometimes” played cards when the card game was at Ms. Samuel’s house. Ms. Jackson said the children in R.A.’s room were always “hollering and screaming” but that the noise did not disturb the card game and the door was always open.[2] Ms. Jackson insisted that on those occasions when it was necessary to go to her bedroom during a card game she unlocked the door and then locked it immediately upon leaving. She conceded that the door to the stairway leading to upstairs was sometimes left unlocked but insisted that the four bedrooms and bathroom upstairs were always locked when she had company and that she and her daughter kept the keys in their pockets. According to Ms. Jackson, K.T. “could never play, because [she] was always hollering and screaming.”
|8On redirect examination, Ms. Samuels conceded that she may have occasionally taken part in the card games at her house “when somebody went to the bathroom” and “probably talked to [her adult guests] when I was standing up, but I didn’t really sit down and talk, because I was watching the kids, and I was doing plates.”
R.A. argues on appeal that, although K.T. stated that his private parts were exposed and her pants were either undone or pulled down, she did not specifically say that any part of his body touched either her genital area or her anus. Additionally, the juvenile argues that KT.’s testimony was internally inconsistent because her testimony at trial that she was eight years old at the time of the incident conflicted with her statement in a letter to her mother that the incidents occurred when she was seven years old and she was unable to pinpoint exact dates of the offenses. The State responds that in the interview at the Child Advocacy Center, the victim “maintained consistently that R.A. ejaculated on or around her vagina on both occasions”; that he removed her pants and moved back and forth until she felt something “slimy” in the vicinity of her “private area” which she indicated to be her vagina.
Based on the record before us, it is clear that something inappropriate happened but ambiguous as to whether the juvenile committed the specific statutory offense, *963 i.e., touched K.T.’s vagina or anus as required by the statute. K.T. wrote in the letter to her mother that R.A. touched her in “bad places.” In the CAC interview, K.T. stated that he touched her “down here” but, as the State failed to submit a copy of the interview on a DVD that complies with the court rules, we are unable to see what part of the body “down here” indicates. When asked in the CAC interview if R.A. touched her “private parts,” K.T. responded in the 19affirmative (“uh huh”) but when asked to define for the interviewer what names she assigned to different parts of the body, K.T. refused to comply. Thus, in the absence of a compliant DVD to view the CAC interview, it is very close as to whether, viewed in the light most favorable to the prosecution, the evidence is sufficient to convince a rational trier of fact that the juvenile committed the offense charged. However, under the applicable standard of review unless the fact finder’s choice is clearly wrong, we cannot substitute our opinion for that of the juvenile court judge who was in the unique position to see the witness testify and, presumably, ascertain that when K.T. indicated R.A. touched her “down here,” she did, in fact, point to her vagina.
Finally, at the time of the offense, the juvenile was thirteen years old and the victim was eight years old, more than the statutorily required three-year age difference. The victim’s inability five years after the incidents to pinpoint exactly the date of the offenses or her age (seven or eight) at the time of the offenses does not rise to the level of inconsistent testimony necessary to overturn the juvenile court judge’s determination. The juvenile court judge, in the unique position of seeing and hearing the witnesses as they testified, clearly found the victim’s testimony credible and that finding is not clearly wrong. Accordingly, under our applicable standard of review, we find that sufficient evidence supports R.A.’s adjudication as a juvenile.
R.A. also challenges the disposition as excessive, arguing that the imposition of secure confinement until his twenty-first birthday is not the least restrictive disposition available.
La. Ch.Code art. 901(B) provides that the court “shall impose the least restrictive disposition authorized ... which the court finds is consistent with the | incircumstances of the case, the needs of the child, and the best interest of society.” La. Ch.Code art. 901(C)(3) provides that commitment of the juvenile to the custody of the Department of Public Safety and Corrections is appropriate when “[a] lesser disposition will deprecate the seriousness of the child’s delinquent act.” “When an excessive disposition is complained of in a juvenile proceeding, the record must be reviewed to determine whether the juvenile court imposed the least restrictive disposition consistent with the circumstances of the case, the child’s best interest, and the best interest of society.” State in the Interest of D.M., 02-2528 (La.App. 4 Cir. 7/2/03), 851 So.2d 1216, 1222 (citations omitted). Accordingly, this court looks to whether the lower court took cognizance of the general guidelines provided in La. Ch. Code art. 901, whether the record reflects an adequate factual basis for the commitment imposed, and whether in light of the circumstances of the case and the background of the juvenile, the disposition is constitutionally excessive. Id. “Absent a showing of manifest abuse of the wide discretion afforded in such cases, a disposition will not be set aside as constitutionally excessive.” Id. (quoting State in the Interest of T.L., 28,564 (La.App. 2 Cir. 5/8/96), 674 So.2d 1122, 1124).
The record reflects that the juvenile court judge listened to and considered the testimony Dr. Jessie Lambert, the clinical psychologist who prepared the predisposi- *964 tional assessment, as well as R.A.’s mentor, Kerry Joseph, a professional athlete. At the conclusion of the dispositional hearing, the judge observed that Dr. Lambert’s assessment focused on future treatment rather than the issue of public safety and rehabilitation. She also found that R.A. had taken, but failed to complete, a number of mandatory or agreed-to rehabilitative programs during the long pendency of this case. Notably, the judge observed that Dr. Lambert’s ^conclusion that R.A. was at a low risk of re-offending was dependent on the truthfulness of the information he received from R.A. (who never admitted responsibility for the offense), did not take into account a previous case from another parish involving R.A., and appeared to be contrary to Dr. Lambert’s recommendation of weekly rehabilitative treatment. Finally, R.A. was almost 20 years old at the time of the court’s disposition order and, accordingly, confinement until his twenty-first birthday represents a term of approximately 15 months. Under the circumstances of this case, we find no abuse of discretion in the disposition.

Conclusion

R.A.’s adjudication and disposition are affirmed.
AFFIRMED.

ORDER

On rehearing granted, the juvenile adjudication is affirmed. Upon review of the videotaped interview, the victim clearly indicated that R.A. touched her vagina when she said he touched her “down here” and on her “private parts” Thus, in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the evidence is indisputably sufficient to support the juvenile adjudication.

. The videotape interview was not transcribed into the hearing transcript. Because the conveyed to this court from the Juvenile Court of Orleans Parish was not in compliance with Local Rule 24, on September 22, 2011, this court ordered the State to produce either a transcript of the CAC interview or a compliant copy of the DVD. On October 13, 2011, the State submitted a transcription of the interview and returned the non-compliant DVD.

. Notably, twice in her testimony Ms. Jackson stated that the door to R.A.’s room was "always closed” but quickly corrected herself to say the door was always open.