STATE OF LOUISIANA IN      *      NO. 2020-CA-0346
THE INTEREST OF M.S.

* 

          COURT OF APPEAL

* 

          FOURTH CIRCUIT

* 

          STATE OF LOUISIANA

* * * * * * *


APPEAL FROM
JUVENILE COURT ORLEANS PARISH
NO. 2019-339-02-DQ-F, SECTION "F"
Honorable Mark Doherty, Judge
* * * * * *
**JUDGE PAULA A. BROWN**
* * * * * *

(Court composed of Judge Roland L. Belsome, Judge Paula A. Brown, Judge
Tiffany G. Chase)

Penny Kissinger
DISTRICT ATTORNEY'S OFFICE, ORLEANS PARISH
1100 Milton-B Street
New Orleans, La 70112

Leon Cannizzaro
DISTRICT ATTORNEY, ORLEANS PARISH
Donna Andrieu
Adele Krieger
DISTRICT ATTORNEY'S OFFICE, ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

       COUNSEL FOR THE STATE/APPELLEE

Cheri J. Deatsch
ORLEANS PUBLIC DEFENDERS
2601 Tulane Avenue, Suite 700
New Orleans, LA 70119

Katherine M. Franks
LOUISIANA APPELLATE PROJECT
P.O. Box 220
Madisonville, LA 70447

Meghan Harwell Bitoun
LOUISIANA APPELLATE PROJECT
P.O. Box 4252
New Orleans, LA 70178--4252


COUNSEL FOR DEFENDANT/APPELLANT


**AFFIRMED AS AMENDED**
**10/5/2020**

PAB
RLB
TGC

The State filed a delinquency petition charging three female juveniles, M.S., M.R., and N.S.,[1] with having committed a carjacking, a violation of La. R.S. 14:64.2, on December 3, 2019. At the time the offense was committed, M.S. was 12 years old, M.R. was 16 years old, and N.S. was 13 years old.

The juveniles were arrested on December 3, 2019, and a continued custody hearing was held on December 5, 2019; M.S. is detained in secure custody. Prior to the adjudication hearing, the juveniles requested to plead guilty to the charge, but the requests were refused by the juvenile court on grounds of the gravity of the case. The juveniles objected and sought a writ on the issue, which was denied.[2]

An adjudication hearing was held on January 16-17, 2019, and on January 17, 2019, the juvenile court found M.S., M.R. and N.S. delinquent of the crime of carjacking. A disposition hearing was held over several days, January 31 and February 13, 14, and 19, 2019. At the conclusion of the hearing on February 19, 2019, the juvenile court, setting forth extensive reasons, imposed a disposition for

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5–1 and 5–2, the initials of the juveniles involved in this matter will be used instead of their names.

[2] *State in the Interest of M.R., et al*, 20-0048 (La. App. 4 Cir. 1/16/20)(unpubl.).

1

M.S., of custody in secure care with the Department of Corrections, Office of Juvenile Justice, until she was 18 years old.[3]  On February 20, 2020, a judgment of disposition was issued by the juvenile court.  The juvenile court ordered that M.S. be given credit for time served from her arrest on December 3, 2019.  In addition, the juvenile court restricted modification of M.S.'s disposition for four years:[4]

> 4. <u>Modification of Disposition</u>
>   a. After four years in the custody of the Department of Public Safety and Correction, Office of Juvenile Justice, the youth's attorney may file a motion to modify the disposition and request a hearing to determine if the youth is eligible for a step-down to non-secure care . . . .

In this timely appeal, M.S. challenges only the judgment of disposition and assigns two errors:

> 1. The juvenile court's rendering of the juvenile life sentence to be non-modifiable for 4 years is an unlawful renunciation of the court's power and duty to modify a juvenile disposition; and
>
> 2. M.S.'s juvenile life sentence violates the Eighth Amendment's ban on excessive punishment.

For the reasons discussed below, we find the juvenile court legally erred by restricting modification of M.S.'s disposition for four years; thus, we amend the judgment of disposition by deleting the restriction.  In all other respects, we affirm M.S.'s disposition, as amended.

## STATEMENT OF FACTS

On December 3, 2019, M.S., N.S., and M.R., devised a plan that lured the victim into giving them a ride to a fictitious location.  As the victim was driving,

---

[3] M.R. and N.S. were ordered to secure care in the custody of the Department of Corrections, Office of Juvenile Justice, until age 21 years old.  Both juveniles have appeals pending in this Court, which are filed under separate docket numbers.

[4] *See* La. Ch.C. art. 909 which will be discussed *infra*.

the girls, collectively, physically forced the victim from her vehicle, causing her injuries and stole the vehicle, which they crashed shortly afterwards.[5]

The victim testified that on December 3, 2019, at approximately 1:30 or 2:00 in the afternoon, she was going to the offices of La Petite Theatre, which were located above H&M in downtown New Orleans. The victim parked her white Honda CRV in the parking lot, which faces the river, behind the H&M building. As she was locking her vehicle, the victim noticed three girls walking through the parking lot, and one of the girls was visibly crying and limping. The girls approached the victim and asked if she knew where the seventh ward was, and the victim pointed in that direction. Next, the girls asked if she knew where the bus stop was, and the victim said she did not know. Since one of the girls was limping and crying, the victim inquired what was wrong. The girls told the victim that they were sisters, their mother lived out of state, and their grandmother, who they lived with, had just died within the last hour. The girls continued that they were trying to get to their grandmother's house located on Mirabeau Avenue to meet with family, and asked the victim to give them a ride. The victim agreed. Two of the girls sat in the back seat of her vehicle—one with a partially gray sweatshirt and another with a leopard print bonnet. The third girl sat in the front seat; the victim

---

[5] At the adjudication hearing, in addition to the victim, the following pertinent witnesses testified: A bystander who videoed a portion of the carjacking testified as to authenticity of the video which was offered, filed, introduced, and admitted into evidence; Officers Herbert Franklin and Chadwick Taylor of the New Orleans Police Department ("NOPD") testified as to the apprehension of the three girls; Officer Taylor, who videoed the show-up identification, testified to the authenticity of the video which was offered, filed, introduced, and admitted into evidence; Kelsey Saltrelli, a crime scene technician who worked the carjacking, testified as to her findings, identified her report, crime scene photographs, and a cell phone recovered from the scene which were offered, filed, introduced, and admitted into evidence; and Detective Douglas Butler, of the NOPD, who conducted the show-up identification procedure, testified that the victim identified all three girls as having committed the carjacking.

described her as the smallest who wore shoes that slipped off easily.[6]  As the victim began driving to the address they had given her, the girls asked her to pull over.  The victim complied.  The girl in the passenger side backseat exited the vehicle.  The girl directly behind the driver's side, that had been complaining her leg was broken, asked the victim for help getting out of the car, and the victim exited the vehicle to help her.  Suddenly, one of the girls started to run.  The victim, sensing something was wrong, got back in her car, and all three girls took off running.  The victim locked her doors and noticed one of the girls' cell phone in the backseat.  Next, the smallest girl with the slip on shoes knocked on the car window and asked the victim if she wanted to come in to see her grandmother.  At that point, the victim noticed her keys were missing.  The victim offered to give the girls the cell phone one of them had left behind, in return for her keys.  According to the victim, the girls became belligerent, demanding that the victim return the cell phone.  The victim began pushing down on the locks of her car, but the girls were unlocking the doors with the victim's key.  Suddenly, the girls opened the car door, and the girl in the gray sweatshirt attempted to pull the victim out of the car.  The victim bit her on the forearm.  The girl in the leopard print bonnet entered the vehicle through the passenger side door and threatened to Mace the victim.  The girls worked together to force the victim out of the vehicle.  The girls took the victim's phone, knocked her glasses off, and pulled her hair.  Two of the girls continued to pull and push on the victim while the third girl hit the victim over the head with the slip on shoes.  The victim testified the girls beat her, kicked

---

[6] In court, the victim identified all three girls referencing the clothing each girl wore on the day of the carjacking.  The State identified, for the record, the name of the girl the victim referred to—M.S., the smallest girl who wore slip on shoes; N.S., the girl who wore the leopard print bonnet; and M.R., the girl with wore the gray sweatshirt.  Also, Officer Taylor identified N.S. as the girl driving the car.

her, and pulled out chunks of her natural hair. After pushing the victim out of the car, the girl in the leopard print bonnet got behind the driver's wheel, and the other two girls jumped in the car. In an attempt to stop the girls from taking the car, the victim stepped in front of the vehicle, and the girl driving lurched the car forward. The victim jumped on the hood of the car. The girls continued to drive the car and tried to shake the victim off the hood. The victim said she hung on to the hood of the car for about 10 blocks. All the while, the girls screamed at the victim to get off the hood and threw things at her through the passenger window, including a metal water bottled that busted the victim's lip. Blood from the victim's lip splattered on the windshield. Finally, amid the victim yelling for them to stop, the girls slammed on the brakes, and the victim jumped off the car.

The girls continued driving the victim's car until they crashed it several blocks later. Less than an hour later, the three girls were apprehended by the New Orleans Police Department ("NOPD") several blocks away from the location of the offense.

The victim testified she was physically injured during the incident; she lost two nails, had a scraped knee, muscle soreness, a busted lip, and she lost clumps of hair. At the disposition hearing, the victim testified that she experienced monetary loss, and suffered with anxiety and panic attacks because of the incident.

## ERRORS PATENT

This Court has adopted a practice of conducting an errors patent review in juvenile delinquency cases. *State in Interest of W.B.*, 16-0642, p. 4 (La. App. 4 Cir.

12/7/16), 206 So.3d 974, 978. A review of the record reveals one error patent, which is raised as an error, and it will be discussed in assignment of error number one.[7]

## DISCUSSION

*Assignment of error no. 1 and error patent (restricting modification of disposition):*

M.S. asserts that the juvenile court lacked authority to order her disposition to be served with the restriction of modification of the disposition for four years and request that this Court strike the restriction. The State counters that it was within the juvenile court's board discretion to restrict the modification.

Louisiana Children Code Article 909 provides:

> Except as provided for in Article 897.1, after the entry of any order of disposition, the court retains the power to modify it, including changing the child's legal custody, suspending all or part of any order of commitment, discharging conditions of probation, or adding any further condition authorized by Article 897(B) or 899(B). It may also terminate an order of disposition at any time while it is still in force.

In *State v. J.R.S.C.*, 00-2108, p. 1 (La. 6/1/01), 788 So.2d 424, 425, the Supreme Court, in a per curiam, explained, "the juvenile may file his motion to modify the judgment of disposition at any time while the disposition is in force. . . ." As noted in Article 909, only La. Ch.C. art. 897.1 limits the period of time in which a juvenile's disposition may be modified:

---

[7] The record does not reflect that the juvenile court advised M.S. of the time period to file post-conviction relief under La. C.Cr.P. art. 930.8, which requires the trial court to inform a defendant of the delays for filing post-conviction relief; however, this language is merely precatory and does not bestow an enforceable right upon an individual defendant. *State ex rel. Glover v. State*, 93-2330, 94-2101, 94-2197, p. 21 (La. 9/5/95), 660 So.2d 1189, 1201; *State v. Handy*, 01-0005, p. 5 (La. App. 4 Cir. 1/24/01), 779 So.2d 103, 105. Nevertheless, in the interest of judicial economy, this Court hereby notifies M.S. that La. C.Cr.P. art. 930.8 generally requires that an application for post-conviction relief be filed within two years of the finality of the adjudication and disposition. *See* La. C.Cr.P. art. 930.8.

6

A. After adjudication of a felony-grade delinquent act based upon a violation of R.S. 14:30, first degree murder or R.S. 14:30.1, second degree murder, the court shall commit the child who is fourteen years or older at the time of the commission of the offense to the custody of the Department of Public Safety and Corrections to be confined in secure placement until the child attains the age of twenty-one years without benefit of parole, probation, suspension of imposition or execution of sentence, or modification of sentence.

\* \* \*

D. Juveniles in secure care for an adjudication for a violation of R.S. 14:42 [first degree rape] or 44 [aggravated kidnapping] shall be eligible for modification after serving thirty-six months of the disposition. Juveniles in secure care for an adjudication for a violation of R.S. 14:64 [armed robbery] shall be eligible for modification after serving thirty-six months of the disposition or, if the disposition is less than thirty-six months, two-thirds of the disposition.

In addition, Article 897.1 is applicable only in certain instances. First, the juvenile must be over the age of 14 years old. In this case, M.S. was 12 years old at the time she was committed to custody. Second, the juvenile must be adjudicated guilty of certain felony-grade delinquent acts which does not include carjacking.

Reading the plain language of La. Ch.C. art. 909 *in pari materia* with Article 897.1, we find the juvenile court lacked authority to restrict modification of M.S.'s disposition. Thus, the juvenile court legally erred in ordering M.S.'s disposition to be served with the restriction of non-modification of the disposition for the first four years.[8] This claim has merit.

When an error in the disposition involves the imposition of restrictions beyond what is authorized in the statutes, appellate courts are instructed to correct

---

[8] *See State v. Johnson*, 55 So.2d 782, 783 (La. 1951)(wherein the Supreme Court held that an illegal sentence is one "not authorized or directed by law"; *State ex rel. S.D.,* 01-670, p. 14 (La. App. 5 Cir. 1/29/02), 807 So.2d 1138, 1146 (wherein the appellate court held that a disposition by the juvenile court must be authorized by law).

the disposition.[9] In addition, "[w]here the defect in [disposition] does not involve the exercise of discretion, the [disposition] may be corrected on appeal by amendment rather than remand." *State in Interest of H.L.F.*, 97-2651, p. 6 (La. App. 4 Cir. 5/20/98), 713 So.2d 810, 813 (citation omitted). Accordingly, we amend the judgment of disposition by deleting this restriction.

*Assignment of error no. 2 (excessive sentence):*

M.S. asserts her disposition in secure custody until the age of 18 years old, which is a juvenile life sentence for a twelve year old, violates the Eight Amendment's "ban on excessive punishment." M.S. contends that juvenile life sentences are rarely imposed, and if imposed, only in cases involving much more severe and violent facts.[10] M.S. argues that her disposition of up to six years in secure care is excessive when compared to somewhat similar cases where the dispositions range from two to three years in secure custody.[11] M.S. complains that the only secure care option for her, WARE Youth Center ("WARE") in

---

[9] La. C.Cr.P. art. 882(A) provides, "[a]n illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review." In *State in Interest of J.T.,* 11-1646, p. 24 (La. App. 4 Cir. 5/16/12), 94 So.3d 847, 862, this Court recognized that La. C.Cr.P. art. 882 is applicable in juvenile proceedings by La Ch.C. art. 104(1). *See*, *In re J.C.*, 09-2000, 2010 WL 2802104, at *3 (La. App. 1 Cir. 7/15/10)(wherein the appellate court found the juvenile court legally erred in ordering the juvenile's disposition, for adjudications for theft and simple burglary, to be served without benefit of parole for the first three years of custody which was not authorized by law).

[10] In support, M.S. cites: *State in the Interest of C.L.,* 15-593 (La. App. 5 Cir. 12/23/15), 184 So.3d 187, wherein C.L., a female, was sentenced to juvenile life for accessory after the fact to second degree murder; and *State ex rel. S.J.,* 10-990 (La. App. 5 Cir. 5/24/11), 66 So.3d 1142, wherein a 15 year old male, was ordered to serve juvenile life until age 21 years old (six years) for an adjudication of aggravated battery with a knife when he held a knife to a women's throat, cut her neck, and threatened to rape the women.

[11] In support, M.S. cites: *State in the Interest of T.W.,* 15-262 (La. App. 5 Cir. 9/23/15), 175 So.3d 504, wherein a juvenile male, received two years in secure custody for illegal possession of a stolen vehicle valued over $500.00; and *State ex rel. A.M.,* 07-1228 (La. App. 4 Cir. 4/9/08), 983 So.2d 176, wherein a male juvenile, after he punched the victim in the face and shattered the victim's teeth during a carjacking, received three years with eighteen months suspended, and released on parole for the balance of the eighteen months.

Coushatta, is over a four hour drive away from New Orleans, and a 2019 report by the Task Force on Secure Care Standard and Auditing which was established by the Louisiana Legislature, expressed concerns regarding oversight at WARE particularly for female youth. M.S. argues the juvenile court failed to impose the least restrictive disposition authorized by law especially in light of M.S. being remorseful and taking responsibility for her actions;[12] her optimistic academic ability and future; her stable home life;[13] and her growth in maturity and good decision making ability since being in secure custody.[14] M.S. prays that her disposition be reversed and the matter remanded to the juvenile court for imposition of a disposition to a term of years and custody with her mother.

---

[12] In a letter from M.S. to the juvenile court, M.S. acknowledged and apologized for her wrongdoing. Also, M.S. wrote a letter to the victim, although it was not contained in the appellate record. Both letters were offered, filed, introduced, and admitted at the disposition hearing.

[13] M.S.'s mother was employed by Tulane hospital, and she attended the hearings. M.S.'s sister attended community college. M.S.'s mother wrote a letter to the juvenile court expressing M.S.'s affirmative qualities and promising to get M.S. involved in positive activities to help M.S. attract better friends.

[14] At the disposition hearing, Daynia Dienna Dupass, a juvenile detention counselor for the Juvenile Justice Intervention Center, explained that her duties were similar to a correctional officer. She observed M.S. while in secure custody and described M.S. as listening to others; doing her school work; having goals for the future; working on and improving social and coping skills; and having strong resolve in the face of adverse circumstances such as being around the predominantly male juveniles in custody at the detention center. This letter was offered, filed, introduced, and admitted into evidence.

In addition, a letter from Kyla Burke, a social worker for the Orleans Parish Public Defender's Office, was offered, filed, introduced, and admitted into evidence. In the letter, Ms. Burke set forth her findings of M.S.'s home life, education, and extracurricular activities. Ms. Burke offered a disposition plan of release to M.S.'s mother with support from community organizations such as Operation Restoration, or if not released on probation, suggested a non-secure care option such as a group home.

The State counters the juvenile court considered the dispositional guidelines of Article 901 and imposed the least restrictive disposition for the circumstances of the case, the needs of the child, and the best interests of society.[15]

In reviewing an alleged constitutionally excessive sentence, this Court in *State in Interest of R.C.*, 16-0966, pp. 2-3 (La. App. 4 Cir. 12/28/16), 208 So.3d 962, 964-65, explained in pertinent part:

> A juvenile has the same constitutional rights against excessive punishment as an adult. *See* La. Ch.C. art. 808; *State in Interest of D.L.S.,* 30,322, p. 11 (La. App. 2 Cir. 1/21/98), 706 So.2d 187, 193. Article 1, Section 20 of the Louisiana Constitution of 1974 provides that "[n]o law shall subject any person . . . to cruel, excessive, or unusual punishment." Although within the statutory limits, a sentence is constitutionally excessive if it is "grossly out of proportion to the severity of the crime" or is "nothing more than the purposeless and needless imposition of pain and suffering." *State* v. *Brogdon,* 457 So.2d 616, 625 (La. 1984). A trial judge has broad discretion when imposing a sentence, and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. In addressing a constitutional excessiveness claim, the relevant issue is "not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion." *State* v. *Smith,* 2001-2574, p. 7 (La. 1/14/03), 839 So.2d 1, 4.

> When a juvenile appeals his disposition as being excessive, the appellate court must first review the record to determine whether the juvenile court has imposed the least restrictive disposition that is consistent with the circumstances of the case, the child's needs, and the best interest of society. *See* La. Ch.C. arts. 683 and 901; *State ex rel. D.M.,* 2002-2528, pp. 9-10 (La. App. 4 Cir. 7/2/03), 851 So.2d 1216, 1222. "[']Following that determination, the reviewing court need only explore for constitutional excessiveness in light of the circumstances of the case and the background of the juvenile.[']" *Id.,* p. 10, 851 So.2d at 1222 (quoting *State in interest of T.L.,* 28,564, p. 2 (La. App. 2 Cir. 5/8/96), 674 So.2d 1122, 1124.).

*See also*, *State in Interest of R.A.*, 11-0440, p. 10 (La. App. 4 Cir. 11/2/11), 101 So.3d 957, 963 (citations omitted)(wherein this Court explained in reviewing a

---

[15] At the disposition hearing, the State called the victim to give her impact statement. In addition, Officer Brian Williams, employed by NOPD, who was present when M.S. was apprehended and taken into custody, testified that M.S. was rude and insulted him. Officer William's body-cam video was offered, filed, introduced, and admitted into evidence.

disposition for excessiveness, a "manifest abuse of the wide discretion" is afforded to the juvenile court, and this Court looks to whether the lower court took cognizance of the general guidelines provided in La. Ch.C. art. 901, if the record reflects an adequate factual basis for the commitment imposed, and in light of the circumstances of the case and the background of the juvenile, is the disposition constitutionally excessive).

In the judgment of disposition, the juvenile court detailed the facts of the case based on the testimony and evidence presented. The juvenile court determined that the juveniles made a plan before they met the victim and "concocted an elaborate false story to take advantage of a stranger's sympathy. . . ." It noted not one of the juveniles backed out of the plan.

The juvenile court succinctly set forth two general rules to guide it in imposing the juveniles' dispositions as provided for in La. Ch.C. art. 901(A) and (B): (1) a juvenile court shall not remove a youth from the parents' custody unless removal is necessary to both to protect the juvenile's welfare or safety and to protect the public safety; and (2) a juvenile court should impose the least restrictive disposition which the court finds is consistent with the circumstances of the case, the needs of the youth, and the best interest of society. The juvenile court reviewed, as to each of the girls, all of the guidelines set forth in La. Ch.C. art. 901. In considering placement of M.S. on probation, the juvenile court considered the guidelines set forth in section (D) of art. 901:

> (1) The child's delinquent conduct neither caused nor threatened serious harm.

> (2) The child did not contemplate that his delinquent conduct would cause or threaten serious harm.

> (3) The child acted under strong provocation.

(4) There were substantial grounds tending to excuse or justify the child's delinquent conduct, though failing to establish a defense.

(5) The victim of the child's delinquent conduct induced or facilitated its commission.

(6) The child or his family has compensated or will compensate the victim of his delinquent conduct for the damage or injury that the victim sustained.

(7) The child has no history of prior delinquency or has led a law-abiding life for a substantial period of time before the commission of the instant delinquent act.

(8) The child's delinquent conduct was the result of circumstances unlikely to recur.

(9) The character and attitudes of the child indicate that he is unlikely to commit another delinquent act or crime.

(10) The child is particularly likely to respond affirmatively to probationary treatment.

(11) The commitment of the child would entail excessive hardship to himself or his family.

The juvenile court concluded, "only five of the statutory considerations suggest probation. . . .[t]he inapplicability of the first six considerations, all of which go to the actual circumstances of the carjacking itself, weigh against probation." Notably, the juvenile court accounted this was not a crime of opportunity but that the juveniles had "jointly planned their intended course of action. . . ."[16]  In addition, it noted that M.S. had three prior separate theft cases, one of which included a charge of criminal damage to property.  The juvenile court continued

---

[16] The juvenile court referenced the testimony of Dr. Sarah Deland, board certified forensic psychologist, who was called by the juveniles' attorneys writing:

> Dr. Deland testified that immature brain development shows itself by the inability to plan, the inability to anticipate consequences, emotional instability, and the lack of coordinated efforts. From the story of what happened here, it appears none of the girls suffers from the common effects of immature brain development. Their actions demonstrated a plan.

that although M.S. successfully completed probation imposed in the unrelated theft cases, she "still participated in the present crime." The juvenile court, in "assess[ing] the appropriateness of removal from the home for treatment and rehabilitation in state custody," considered the factors in section (C) of art. 901:

 (1) There is an undue risk that during the period of a suspended commitment or probation the child will commit another crime.

(2) The child is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment.

(3) A lesser disposition will deprecate the seriousness of the child's delinquent act.

(4) The delinquent act involved the illegal carrying, use, or possession of a firearm.

The juvenile court recognized that in the present case there was no illegal carrying, use, or possession of a firearm. It noted carjacking was designated as a crime of violence. La. R.S. 14:2(B)(28). The juvenile court determined that M.S. posed a risk to commit another crime as she previously was given a second chance through probation but choose to commit another crime. The juvenile court opined that the "three youths recklessly endangered the victim's life, their own lives, and lives of innocent people on the street, and that they each pose an undue risk to the public that each will commit another offense." In explaining the factors which warranted commitment to secure care, the juvenile court referenced that the testimony at the disposition hearing reflected that M.S. did well in pre-trial detention and her behavior had improved while in custody, noting:

Defense counsel argued that it was the need for wrap-around services[17] that lead to the girls' improved behavior, yet the bottom line is that those services were provided in a controlled environment

_____

[17] Wrap-around services are coordinated services to provide safety, stability, and medical and mental health support, education and strong social activities.

with structure, regimentation, and schedule. The fact that wrap-around services were available in the community, though unused, for each youth prior to their detention, makes the point that it is the structured conditions of a controlled environment that have given the services provided the opportunity to have a positive effect on each of them.

The juvenile court concluded that "each youth is in need of correction treatment and a custodial environment . . . ," and found that "a disposition less than secure care in OJJ custody will depreciate the significance and seriousness of what happened. . . ."

We conclude that the juvenile court's imposition of secure care is supported by the record.

Next, M.S.'s disposition was within the statutory limits.[18] Although a disposition is within the statutory limits, it can be constitutionally excessive if it is "'grossly out of proportion to the severity of the crime' or is 'nothing more than the purposeless and needless imposition of pain and suffering.'" *State in Interest of R.C.*, 16-0966, p. 2, 208 So.3d at 964-65 (quoting *State v. Brogdon*, 457 So.2d 616, 625 (La. 1984)). From the record, it is clear that the juvenile court carefully determined that the disposition imposed was the least restrictive disposition consistent with the circumstances of the case, the needs of the child, and the best interest of society. In addition, the judgment of disposition, as amended, allows modification by the juvenile court at any time to continue to

---

[18] The children's code does not set forth a specific a term for a disposition for carjacking. Louisiana Children's Code Article 898 pertinently provides that "[n]otwithstanding any other provision of law to the contrary, no judgment of disposition shall remain in force for a period exceeding the maximum term of imprisonment for the felony forming the basis for the adjudication," and if the child was "under thirteen at the time of a commitment to custody of the Department of Public Safety and Corrections, . . . the judgment shall terminate upon the child's reaching age eighteen." Turning to the adult code, the possible term of imprisonment for carjacking is two to twenty years, without the benefit of probation, parole, or suspension of sentence, and carjacking is considered a crime of violence. La. R.S. 14:64.2(B) and 14:2(B)(28) In the case *sub judice*, M.S. was twelve-years old at the time of her commitment to custody to the Department of Public Safety and Correction; as result, she faced a potential disposition term of six years until her eighteenth birthday which is within the statutory limit of La. R.S. 14:64.2.

ensure the least restrictive disposition for M.S. that is consistent with the circumstances of the case, the child's needs, and the best interest of society. Although M.S. points out similar cases where a less severe disposition was imposed and we recognize juvenile life dispositions should be sparingly imposed, we do not find M.S.'s disposition was grossly out of proportion to the severity of the offense committed or a needless imposition of pain and suffering.

Based on the record before this Court, and considering the wide discretion afforded a juvenile court in juvenile matters, we find the juvenile court did not abuse its discretion in the dispositional phase. This claim lacks merit.

## CONCLUSION

The juvenile court legally erred by restricting modification of M.S.'s disposition; thus, we amend the judgment of disposition by deleting the restriction. In all other respects, M.S.'s disposition is affirmed, as amended.

**AFFIRMED AS AMENDED**