NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-1028

STATE IN THE INTEREST OF S.D.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
ABBEVILLE CITY COURT
PARISH OF VERMILION, NO. JU-5936
HONORABLE MARIE B. TRAHAN, CITY COURT JUDGE

\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, and John D. Saunders and Jimmie C. Peters, Judges.

ADJUDICATION AFFIRMED; JUDGMENT OF DISPOSITION
VACATED IN PART; AND REMANDED.

**Michael Harson**
**District Attorney**
**Fifteenth Judicial District**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
      **City of Abbeville**

**Jermaine D. Williams**
**Attorney at Law**
**1313 Lafayette Street**
**Lafayette, LA 70501-6841**
**(337) 235-3989**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**S. D.**

**Aimee F. Hebert**
**Attorney at Law**
**613 N. Church St.**
**Kaplan, LA 70548**
**(337) 643-6800**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**City of Abbeville**

**PETERS, J.**

S.D.[1] appeals his adjudication as a juvenile delinquent as well as the disposition of the juvenile court. For the following reasons, we affirm S.D.'s adjudication as a juvenile delinquent, vacate part of the judgment of disposition, and remand the matter to the juvenile court for further proceedings consistent with this opinion.

On January 28, 2013, the State of Louisiana (state) filed a petition charging S.D. with having committed a delinquent act on January 19, 2013. Specifically, the state charged S.D. with having committed the armed robbery of Hunter Orgeron, an offense defined in La.R.S. 14:64. A subsequent hearing held on June 18, 2013, resulted in S.D.'s adjudication as a juvenile delinquent. Thereafter, at the July 16, 2013 disposition hearing, the juvenile judge entered a judgment of disposition ordering that S.D. be placed in the custody of the Louisiana Department of Public Safety and Corrections (DPSC) until his twenty-first birthday. The juvenile judge further ordered that the disposition be without the benefit of parole, probation, suspension of imposition or execution of sentence, or modification of sentence. Counsel for S.D. objected to the disposition at the hearing, and subsequently perfected this appeal.

In his appeal, S.D. asserts three assignments of error:

1. The [juvenile] court erred by failing to grant a mistrial when newly discovered evidence was presented by the State's witness at [the adjudication hearing] despite the [Juvenile]'s timely request for discovery.

2. There was insufficient evidence to support [an adjudication as a juvenile delinquent based on] the charge [of armed robbery].[2]
3. The [disposition] imposed by the [juvenile] court was excessive.

---

[1]The Juvenile's initials are used in accordance with Uniform Rules—Courts of Appeal, Rule 5-2.

[2] S.D.'s brief erroneously identifies the underlying offense as "Attempted Possession of Cocaine."

### *Errors Patent*

Louisiana Code of Criminal Procedure Article 920(2) provides that one of the two matters which shall be considered on appeal is "[a]n error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." These are commonly referred to as "errors patent," and although the Louisiana Children's Code is silent as to whether a juvenile criminal proceeding is entitled to an error patent review, this court has found that such a review is mandated by La.Ch.Code art. 104 and La.Code Crim.P. art. 920. *See State in the Interest of J.C.G.*, 97-1044 (La.App. 3 Cir. 2/4/98), 706 So.2d 1081. After reviewing the record in this matter, we find a number of such errors. The question thus presented is whether these errors should be recognized as having affected the ultimate disposition.

We first note that the state did not timely institute the delinquency proceeding. The record reflects that the juvenile judge held a continued custody hearing on January 25, 2013, and ordered S.D. continued in the state's custody. The state did not institute the delinquency proceeding by filing its petition until January 28, 2013, or three days later. Louisiana Children's Code Article 843(A) provides that "[i]f a child is continued in custody prior to adjudication, the delinquency petition shall be filed within forty-eight hours of the hearing to determine continued custody." If the state fails to timely file the petition, "the child shall be released." La.Ch.Code art. 843(B). However, once a juvenile is adjudicated a delinquent, the issue of timeliness becomes moot. *State in the Interest of J.L., Jr.,* 592 So.2d 435 (La.App. 5 Cir. 1991), *writ denied*, 597 So.2d 1031 (La.1992). Given the facts before us, this issue is now moot and did not affect the ultimate disposition.

Next, we note that when S.D. appeared to answer the state's petition, the juvenile judge did not advise him of the "items" set forth in La.Ch.Code art. 855(B):

>   (1)  The nature of this delinquency proceeding.

>   (2)  The nature of the allegations of the petition.

>   (3)  His right to an adjudication hearing.

>   (4)  His right to be represented by an attorney, his right to have counsel appointed as provided in Article 809, and his right in certain circumstances authorized by Article 810 to waive counsel.

>   (5)  His privilege against self-incrimination.

>   (6)  The range of responses authorized under Article 856.

>   (7)  The possible consequences of his admission that the allegations are true, including the maximum and minimal dispositions which the court might impose pursuant to Articles 897 through 900.

However, in *State in the Interest of K.G.*, 34,535 (La.App. 2 Cir. 1/24/01), 778 So.2d 716, the second circuit found that the juvenile judge failed to timely advise the juvenile of the enumerated rights as set forth in La.Ch.Code art. 855(B), but concluded that the error was harmless given the fact that the juvenile was represented by counsel and denied the allegations of the petition. *See also State in the Interest of J.G.*, 94-194 (La.App. 5 Cir. 7/26/94), 641 So.2d 633. In the matter before us, S.D. was represented by counsel and denied the allegations of the petition. Following the decision in *K.G.*, we find this error to be harmless. Therefore, we find that this error did not affect the ultimate disposition.

We next note that there exists a conflict between the juvenile court minutes, the custody order signed by the juvenile judge, and the disposition hearing transcript. In the disposition hearing transcript, the juvenile judge stated:

>   Therefore [S.D.] is hereby sentenced to the custody of the Department of Public Safety and Corrections, to be confined in secure placement

3

for the term of juvenile life. I (inaudible) *until he reaches his twenty-first birthday* without benefit of parole, probation[,] suspension of this disposition or execution of sentence, or modification of sentence.

(Emphasis added.)

The court minutes arising from the disposition hearing state that S.D. was placed in the "custody of the Department of Corrections/Division of Juvenile Justice for juvenile life, *not to exceed the age of 21*, without the possibility of parole or probation." (Emphasis added.) Finally, the custody order arising from the disposition hearing also indicates that S.D.'s length of disposition was "NOT TO EXCEED AGE OF 21," but it does not mention the denial of benefits. Because this error does affect the ultimate disposition, we order the juvenile judge to amend the court minutes of the disposition hearing and the custody order arising from the disposition hearing to correspond to the disposition reflected in the disposition hearing transcript. *See State in the Interest of B.A.*, 12-659 (La.App. 3 Cir. 12/19/12), 104 So.3d 833.

We next note that the juvenile judge failed to inform S.D. of the two-year prescriptive period for filing post-conviction relief set forth in La.Code Crim.P. art. 930.8(C). Although the Louisiana Children's Code contains no similar provision, this court has previously held that this notice should be given. *B.A.*, 104 So.3d 833, and *State in the Interest of J. F.*, 03-321 (La.App. 3 Cir. 8/6/03), 851 So.2d 1282. Thus, because this error patent does affect the ultimate disposition, we order the juvenile judge to inform S.D. of the provisions of La.Code Crim.P. art. 930.8 by sending the appropriate written notice to him within ten days of the rendition of this opinion and to file written proof in the record that S.D. received the notice.

Finally, we find it necessary to address the timeliness of the adjudication hearing. With regard to that issue, La.Ch.Code art. 877 provides:

4

A. When the child is charged with a crime of violence as defined in R.S. 14:2(B) and the child is continued in custody pursuant to Chapter 5 of this Title, the adjudication hearing shall commence within sixty days of the appearance to answer the petition. In all other cases, if the child is continued in custody pursuant to Chapter 5 of this Title, the adjudication hearing shall commence within thirty days of the appearance to answer the petition.

B. If the child is not continued in custody, the adjudication hearing shall commence within ninety days of the appearance to answer the petition.

C. If the hearing has not been commenced timely, upon motion of the child, the court shall release a child continued in custody and shall dismiss the petition.

D. For good cause, the court may extend such period.

The state charged S.D. with a crime of violence and he was continued in custody. Applying La.Ch.Code art. 877(A), the adjudication hearing should have commenced no later than sixty days from his February 7, 2013 appearance to answer the petition, and it did not commence until June 18, 2013. However, from February 7, 2013, through June 18, 2013, the following proceedings occurred:

February 7, 2013: S.D. answered the petition and the juvenile judge issued an order for his continued detention, and set the adjudication hearing for March 14, 2013.

February 21, 2013: Jermaine Williams filed a motion to enroll as counsel for S.D.

March 12, 2013: Counsel for S.D. requested a continuance of the adjudication hearing. The state offered no objection, and S.D.'s new counsel waived all time delays.

March 14, 2013: The juvenile judge ordered S.D.'s continued detention pending trial and reset the adjudication hearing for April 23, 2013.

April 4, 2013: A motion for bond reduction was set for this date, but S.D.'s counsel requested a continuance based on S.D.'s absence from the proceeding. The state offered no objection and the juvenile judge granted the continuance.

April 10, 2013: The bond reduction hearing was held, the juvenile judge granted the motion for reduction, and S.D. posted bond.

5

April 23, 2013: S.D.'s counsel moved for a continuance of the adjudication hearing because of a death in his family.

April, 24, 2013: The juvenile judge granted the motion over the objection of the state and reset the adjudication hearing for May 13, 2013.

May 13, 2013: S.D.'s counsel moved to have the juvenile judge recused, and, over the objection of the state, the presiding juvenile judge recused himself and requested that the Louisiana Supreme Court appoint a judge to preside over the litigation. The recusal proceeding required that the adjudication hearing scheduled for that day be continued.

May 17, 2013: The Louisiana Supreme Court appointed Judge Marie Elise Trahan of the Crowley City Court as juvenile judge *ad hoc*.

June 18, 2013: Judge Trahan conducted the adjudication hearing.

Thus, the adjudication hearing was initially set within the sixty day time period, but was continued several times either at the request of S.D.'s counsel or as a direct result of a defense motion. In *State in the Interest of Franklin*, 95-423 (La.App. 4 Cir. 7/26/95), 659 So.2d 537, *writ denied*, 95-2162 (La. 11/17/95), 663 So.2d 711, the fourth circuit concluded that the state is not required to seek an extension of the time period pursuant to La.Ch.Code art. 877(D) where the time period is extended due to reasons not attributable to the state. Following the rationale of *Franklin*, we find that under the facts of the matter before us, there was good cause for the delay in the holding of the adjudication hearing. Thus, the failure to comply with La.Ch.Code art. 877(A) did not affect the ultimate disposition.

### *Assignment of Error Number Two*

We will consider this assignment first because it addresses the sufficiency of the evidence presented by the state. When issues are raised on appeal as to the sufficiency of the evidence as well as other trial errors, a reviewing court must first

6

determine the sufficiency of the evidence.  *State v. Hearold*, 603 So.2d 731 (La.1992).

In considering the sufficiency issue, we first note that the supreme court has addressed this issue and set forth the following guidelines:

> In a juvenile proceeding, the state's burden of proof is the same as in a criminal proceeding against an adult—to prove beyond a reasonable doubt every element of the offense alleged in the petition. La. Ch.Code art. 883; *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984).

*State in the interest of D.P.B.*, 02-1742, pp. 4-5 (La. 5/20/03), 846 So.2d 753, 756.

Louisiana Revised Statutes 14:64(A) provides that "[a]rmed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."  In this case, the state charged S.D. with having taken Hunter Orgeron's cellular telephone from him at gunpoint.

At the adjudication hearing, Hunter Orgeron (Hunter) testified that prior to the armed robbery, he mentioned to some of his friends that he was interested in selling a cellular telephone, and that S.D. telephoned him on the day before January 19, 2013, and inquired about purchasing it from him.  According to Hunter, he and S.D. continued to communicate by text messages, and ultimately agreed to meet face-to-face at the Willowind Apartments in Abbeville, Louisiana.

Hunter testified that S.D. instructed him to come to the apartment complex on the evening of Saturday, January 19, 2013, and park next to a silver Pontiac.

According to Hunter, S.D. and another male approached his parked Mustang from the apartment complex, and when he rolled his window down, he was immediately confronted by S.D. who pointed a gun at his neck. Hunter testified that the other male then entered his vehicle on the passenger side and began punching him in the face, and S.D. demanded that he produce his iPad. When Hunter told S.D. that he did not have the iPad, both S.D. and the other male searched the vehicle. Hunter testified that they did not find the iPad, but took his cellular telephone from the cup holder in the center console of the vehicle as well as a hat he had purchased earlier in the day.

According to Hunter, when S.D. and the other male walked back toward the apartment complex, he left the scene and traveled to his girlfriend's house to tell her he was going to the police station. While at her house, he telephoned his parents and told them to meet him at the police station. When he arrived at the Abbeville City Police Station he did not see anyone for approximately thirty minutes, and it took him an additional forty-five minutes for him to complete a written statement to Officer Jonathan Touchet. The statement itself reflects that it was written and signed at approximately 9:40 p.m. on January 19, 2013.

On cross-examination, Hunter acknowledged that he did not initially inform Officer Touchet of the stolen hat, but stated that in the midst of everything else, he simply forgot to do so. He also acknowledged that he told Officer Touchet that he had been robbed approximately thirty minutes before arriving at the police station. When S.D.'s counsel suggested that the investigating officers placed the time of the robbery at approximately 5:30 p.m. on January 19, Hunter testified that it could have been earlier because the sun had gone down about the time of the robbery. At the same time, he repeated his prior testimony that it was dark when the robbery

8

occurred. S.D.'s counsel further pointed to Hunter's written statement wherein he stated that he went to a friend's house immediately after the robbery, but did not mention that the friend was his girlfriend. Hunter explained that he did not wish to involve her in the matter. Additionally, Hunter further explained that the investigating officers never asked him the name of the friend, and his girlfriend was never interviewed in the investigation.

With regard to the conflict over the time of the robbery, on redirect the state produced a copy of a telephone record reflecting that Hunter last used the stolen telephone at approximately 8:53 p.m. on January 19, 2013.

Hunter also testified on direct that immediately after the robbery, he observed a woman sitting on a balcony at the apartment complex immediately after the robbery, and Markelia Guidry (Markelia) testified that she was that woman. According to Markelia, at approximately 10:45 p.m. on January 19, 2013, two officers came to her apartment door and she gave them a written statement concerning what she had seen that evening while sitting on her balcony. She testified that she observed two males with hoods pulled over their heads come from the apartment complex, and she overheard one of the two talking on a cellular telephone directing someone to park next to her silver Pontiac in the parking lot. She then observed a Mustang automobile pull up next to her vehicle, and observed the two males approached the Mustang. According to Markelia, one of the two males walked to the passenger side of the Mustang, and the other walked to the driver's side. She heard one of the males say something about an iPhone or iPad, and observed the male on the passenger side "swing a couple of licks" at the driver, but assumed that the men were simply playing. From the tone of the voices, she concluded that they were teenagers, and not "grown men." When the

9

two males left the automobile, she observed that the male on the passenger side left with a "white box or something."

Although Markelia had seen S.D. around the apartment complex, she was not able to identify him as one of the two individuals who approached the Mustang, although she could not say that it was not him either. Neither the investigating officers, the state, nor S.D.'s counsel questioned Markelia concerning the time of the incident.

Max Broussard (Max) testified that he had known S.D. for approximately one year before the adjudication hearing, having had a high school class with him the year before. According to Max, sometime before January 19, 2013, S.D. telephoned him three or four times seeking Hunter's telephone number. S.D. told Max he wanted to get in touch with Hunter to purchase a cellular telephone from him. Max testified that he subsequently texted the telephone number to S.D.

Caldrick Broussard (Caldrick), who was sixteen years of age when he testified at the adjudication hearing, identified himself as S.D.'s cousin. He testified that on January, 18, 2013, he and D'Vonte Scott (D'Vonte) were visiting his sister, Denisha Green (Denisha), who then resided in the Willowind Apartment complex, and recalled being visited by S.D. on that evening.[3] According to Caldrick, S.D. had been "chillin" with him and D'Vonte earlier in the evening, but left and returned around 11:00 p.m. When he returned, S.D. asked about "[Caldrick and D'Vonte] helping him rob somebody." Caldrick testified that when S.D. showed him a gun, he told S.D. that he would not become involved and asked him to leave. According to Caldrick, he and S.D. became involved in a physical

---

[3] He was interviewed by Detective Dan Suire of the Abbeville Police Department on March 13, 2013, and provided Detective Suire with a written statement on that date.

altercation which resulted in S.D. being physically evicted from the apartment. Caldrick testified that Denisha was asleep when the altercation occurred.

On cross-examination, Caldrick acknowledged that he and D'Vonte had discussed the matter since the robbery. Additionally, he explained that he did not make the statement for almost two months because that was the first time anyone asked him about the incident.

Officer Touchet testified that after he interviewed Hunter, he and Officer Shane Meaux went to the scene and interviewed Markelia. He acknowledged the when Hunter arrived at the police station on the evening of January 19, 2013, the officer personnel were involved in bringing a recently arrested individual under control, and Hunter was not seen immediately.[4] Officer Touchet testified that he wrote the statement signed by Hunter based on what Hunter dictated to him.

After taking the statements of Hunter and Markelia, Officers Touchet and Meaux, accompanied by two parish deputies,[5] went to S.D.'s residence and found only his mother present. Later that evening, S.D.'s mother brought him to the Abbeville Police Station at approximately 12:25 a.m. and, in the presence of his mother, Officer Touchet interviewed him. S.D. denied being at the Willowind Apartments earlier that evening, and denied robbing or even knowing Hunter. After completing the interview, the investigating officers released S.D. to the custody of his mother.

When questioned on cross-examination, Officer Touchet testified that Hunter identified S.D. as one of the individuals who robbed him. However, the officer could not remember what Hunter told him about the time of the robbery,

---

[4] Officer Touchet estimated that Hunter had to wait fifteen to twenty minutes before anyone could talk to him.
[5] Officer Touchet testified that the deputies accompanied them because S.D. lived outside the city limits.

although he did recall that Hunter told him he had stopped to telephone his parents before coming to the police station to report the offense. When S.D.'s counsel questioned Office Touchet concerning the stolen hat, the officer stated that Hunter never mentioned the hat.

Zachary Suire (Zachary), who was fifteen years old at the time of the adjudication hearing, testified that he had been friends with S.D. since early childhood. In his initial testimony, Zachary testified that on January 21, 2013, he posted the following message to his Facebook account at the request of S.D.: "Who want [sic] a red Galaxy S3 from A T & T from two hundred." According to Zachary, S.D. asked him to post the message a day or two before. However, in subsequent questioning, Zachary changed his testimony to state that S.D. had only asked him if he knew anyone who might be interested in purchasing such a telephone and had not requested that he post the message.

On cross-examination, Zachary seemed to go back to his original testimony that S.D. had asked him to post the message. Additionally, his memory concerning the discussions between him and S.D. was rather vague. He acknowledged that in his February 8, 2013 written statement to the police, he had stated that S.D. was always asking him to post "stuff" on his Facebook page.

At this point, the state rested and S.D. called a number of witnesses in his defense, beginning with Detective Stan Suire of the Abbeville Police Department. Detective Suire testified that at some point in the investigation, he was asked "to interview a couple of boys who might have known something about the crime." However, he could not initially identify the individuals he interviewed, did not remember their names, and testified that his memory was "terrible." The most he could remember was that he talked to two "boys," one who seemed to have a large

12

amount of information about the robbery, and another who knew very little. Further questioning of the detective revealed that Caldrick was the individual with the knowledge, and D'Vonte was the other individual. According to Detective Suire, D'Vonte did not corroborate Caldrick's version of the altercation on the evening of January 18, 2013. However, Detective did not say that D'Vonte gave a different statement. Instead, D'Vonte simply "didn't want to talk about" the incident.

Later in his testimony, Detective Suire also acknowledged that he questioned an individual named Walter (Walter) August as a possible suspect, although he could not remember where or how he acquired the man's name. All he remembered about his encounter with Walter was that when questioned about the robbery, he denied any involvement, and, according to Detective Suire, "[t]hat was it." Detective Suire did not classify his encounter with Walter as an "interview." Rather, he suggested that he asked only one question and the denial ended the investigation of Walter.

Finally, Detective Suire testified that he "might have talked to" Markelia. In fact, Detective Suire recorded a statement from Markelia wherein she was again questioned concerning what she had seen from her balcony. Detective Suire testified that he asked Markelia if one of the individuals she saw was Walter August and she told him that she did not know anyone named Walter August. Walter August's name was mentioned in in the videotaped interview of Markelia which was provided S.D. before the adjudication hearing.

Endia Davis (Endia) is S.D.'s older sister and specifically recalled that on the evening of Saturday, January 19, 2013, her brother was at their mother's home with her. According to Endia, she left home at 1:30 p.m. that day to pick up Taisha

Ford's son she was to babysit that evening,[6] and that S.D. was at home when she left. She returned with the child at approximately 2:00 p.m. and she and S.D. watched television together until 10:00 p.m., when she left to return the child to its home. Endia testified that S.D. was still with her when she received a telephone call from their mother who was looking for S.D.

S.D.'s mother testified that when she returned home from the hairdresser at approximately 11:30 a.m. on January 19, 2013, Endia and S.D. were home. She further testified that Taisha Ford dropped her child off before 2:00 p.m. for Endia and S.D. to babysit. S.D.'s mother testified that her son could not have left home between 5:00 and 9:30 p.m. without her knowing it,[7] and that Endia and S.D. had brought the child home at approximately 9:30 p.m., returning at 11:00 p.m. According to S.D.'s mother, the police officers arrived at her residence after Endia and S.D. left with the child, and that she telephoned Endia. On the first time, Endia did not answer her telephone, but she answered the second time. By the time of the second call, the officers had left her home.

S.D. testified at the adjudication hearing, and in his testimony he denied speaking to Max about Hunter's cellular telephone; denied having spoken to or texted Hunter on Friday, January 18, 2013; denied having placed a gun to Hunter's head; denied showing Caldrick a gun on Friday night, January 18, 2013; and denied asking Zachary to post anything on the internet. In fact, he testified that he would not have known Hunter if he walked past him.

According to S.D., he and his sister went to Denisha Green's apartment on Friday, January 18, 2013, and the two of them were there from 1:00 p.m. until 5:00

---

[6] Endia identified Taisha Ford as her second cousin.

[7] S.D.'s mother did acknowledge that she, Endia, S.D., and the small child all went to the Abbeville Pizza Hut between 7:00 and 7:45 p.m. to pick up a pizza.

p.m. He testified that he did not return to the apartment that night so he could not have shown Caldrick a weapon. When attempting to explain why Caldrick would say that he brandished a weapon on that night, he suggested that Caldrick was responding to an argument they had a few days earlier concerning Caldrick's girlfriend.

Concerning his activities on the afternoon of the armed robbery, S.D. testified that he was home when Endia returned with the child at approximately 2:00 p.m., and that his mother was mistaken when she stated that Taisha Ford had dropped the child off. According to S.D., the only time he left his mother's house was when everyone went to get pizza. On cross-examination, S.D. had no explanation for the testimony presented by the various witnesses for the state, other than Caldrick.

On rebuttal, the state called Denisha to testify. She testified that she is S.D.'s cousin, and that S.D.'s mother telephoned her on January 19, 2013, looking for S.D. Specifically, S.D.'s mother asked her if S.D. had gone to the movie with her, and she told her that he had not. On cross-examination by S.D.'s counsel, Denisha testified that S.D. was at her apartment with Caldrick and D'Vonte on Friday before the Saturday armed robbery, having come over with Endia, and that he left sometime around 10:00 p.m.

In her reasons for adjudicating S.D. a juvenile delinquent, the juvenile judge stated that she believed the testimony of Max, Zachary, Caldrick, Denisha, and Hunter. S.D. asserts on appeal that the juvenile judge's credibility determinations were erroneous. He asserts that the only witness to identify him as the one who committed the offense was Hunter and that his testimony was not credible.

S.D.'s primary argument concerning Hunter's credibility relates to the timeline for the robbery set forth in the evidence. He points to Hunter's initial testimony that the robbery occurred at approximately 7:00 p.m., and then suggests that Hunter contradicted himself on cross-examination when confronted by the assertion that the investigating officers would testify that the robbery occurred closer to 5:30 p.m. We note that this line of questioning by counsel for S.D. was not supported by the testimony of the investigating officers. Officer Touchet did not indicate any time frame for the robbery in his testimony, and the testimony of Detective Suire on this point is questionable at best. Detective Suire did say that he concluded the robbery occurred at approximately 5:30 p.m., but he offered nothing to suggest why he reached this conclusion, and his admissions concerning his complete lack of memory with regard to all other aspects of his investigation does not support this conclusion. All of the other evidence with regard to the timeline supports Hunter's testimony that the robbery occurred later in the evening.

S.D. also points to the fact that Hunter initially told the investigating officer that he went to a friend's house after the robbery, but did not explain that it was his girlfriend's house. On cross-examination, he stated that he did not identify the home as that of his girlfriend's because he did not want to get her involved. We find this contradiction to be a distinction without a difference.

Considering the evidence in a light most favorable to the state, we find that there was sufficient evidence to convince the juvenile judge that all of the elements of the underlying offense giving rise to the delinquency adjudication were proved beyond a reasonable doubt. *State in the interest of D.P.B.*, 02-1742 (La. 5/20/03), 846 So.2d 753. We find no merit in this assignment of error.

16

### *Assignment of Error Number One*

We now return to S.D.'s first assignment of error wherein he asserts that the juvenile judge erred in rejecting his motion for a mistrial based on the testimony of Detective Suire. This issue arises because of Detective Suire's reference to having interviewed D'Vonte Scott and Walter August during his investigation. S.D. sought a mistrial because, despite discovery requests, the state had not informed him in advance of the adjudication hearing that Detective Suire had interviewed D'Vonte and Walter.

As previously stated, Detective Suire was called as a witness for S.D., and, during his testimony, he referred to his interview with "a couple of boys" whom he could not identify. After significant subsequent questioning, it was ultimately determined that the two "boys" were Caldrick and D'Vonte. The end result of his interview with D'Vonte was not that he directly contradicted Caldrick, but that he simply did not wish to provide Detective Suire with any information.

Detective Suire's encounter with Walter also resulted in no information concerning the robbery. According to Detective Suire, the interrogation went no further than him asking Walter about his possible involvement in the robbery and Walter denying any involvement.

While acknowledging that he had been provided both D'Vonte's and Walter's name in discovery through statements of Caldrick and Markelia, S.D. argues that he was not aware of the extent of the police investigation of the two individuals. The state argues in response that the information obtained from the interviews is not exculpatory, the names were made available to S.D. prior to trial, and it is not the state's duty to conduct S.D.'s investigation for him.

17

In rejecting S.D.'s motion for a mistrial, the juvenile judge concluded that evidence provided by Detective Suire was not exculpatory, and, therefore, the failure of the state to provide it to S.D. was not a "violation of due process." Specifically, the juvenile judge found that the state is not required to ascertain every thought that might arise in the head of an investigating officer, and in this case, it was questionable as to why Detective Suire even brought these names of these individuals up given the minimal effect their input had on the investigation.

We agree with the juvenile court's analysis on this point as the state's discovery burden in a criminal proceeding is well settled:

> Under Louisiana law, the prosecution is not required to provide unlimited discovery. However, the state must disclose all evidence favorable to an accused, material to guilt or punishment. *State v. Black*, 34,688 (La.App. 2d Cir.5/9/01), 786 So.2d 289, *writ denied*, 01–1781 (La.5/10/02), 815 So.2d 831.

*State v. Turner*, 44,920, 44,921, pp. 10-11 (La.App. 2 Cir. 2/3/10), 32 So.3d 277, 284-85, *writ denied*, 10-680 (La. 3/25/11), 61 So.3d 657.

As stated by the United States Supreme Court in *Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568 (1972), "[w]e know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *See also U.S. v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392 (1976).

We find no merit in this assignment of error.

### *Assignment of Error Number Three*

S.D.'s final assignment of error relates to the disposition imposed by the juvenile court. As previously stated, the juvenile judge ordered that S.D. be placed in the custody of DPSC in a secure placement until his twenty-first birthday, and "without benefit of parole, probation suspension of this disposition or execution of

18

sentence or modification of sentence." S.D. asserts that this disposition is excessive.

Having been adjudicated a juvenile delinquent for the offense of armed robbery, S.D.'s disposition after adjudication is governed by La.Ch.Code art. 897.1(B) which provides:

> After adjudication of a felony-grade delinquent act based upon a violation of R.S. 14:64, armed robbery, the court shall commit the child who is fourteen years of age or older at the time of the commission of the offense to the custody of the Department of Public Safety and Corrections to be confined in secure placement for the length of the term imposed by the court at the disposition hearing without benefit of parole, probation, suspension of imposition or execution of sentence, or modification of sentence.

S.D.'s birthday is August 21, 1996, and therefore he was over fourteen years of age on January 19, 2013, the date of the underlying offense. The mandatory language denying benefits is so strong that it has been declared the "public policy of this state" in La.R.S. 15:906(B) because armed robbery is such a serious offense that "the protection of society is the primary objective."

Still, while the disposition that may be imposed for the offense of armed robbery is without benefits, the length of confinement under La.Ch.Code art. 897.1(B) is subject to the discretion of the juvenile judge. *See State ex rel. A.M.*, 98-2752 (La. 7/2/99), 739 So.2d 188. Additionally, La.Ch.Code art. 808 provides that "[a]ll rights guaranteed to criminal defendants by the Constitution of the United States or the Constitution of Louisiana, except the right to jury trial, shall be applicable in juvenile court proceedings brought under this Title." These include the right against "excessive punishment." *State in Interest of D.L.S.*, 30,322, p. 11 (La.App. 2 Cir. 1/21/98), 706 So.2d 187, 193.

With regard to the consideration of a custodial environment, La.Ch.Code art. 901(A) provides that "the court shall not remove a child from the custody of his

parents" absent a finding that "his welfare or the safety and protection of the public cannot . . . be adequately safeguarded without such removal." Additionally, La.Ch.Code art. 901(B) provides that "[t]he court should impose the least restrictive disposition authorized by Articles 897 through 900 of this Title which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society." Finally, La.Ch.Code art. 901(C) and (D) sets forth a number of factors for the juvenile judge to consider when considering a disposition of custody to DPSC. S.D. argues that the juvenile judge erred in not considering these dispositional guidelines. We find no merit in this argument as La.Ch.Code art. 901(E) clearly states that "[t]he general disposition guidelines set forth in Paragraphs A through D of this Article do not apply when a child has been adjudicated a delinquent for the violation of . . . R.S. 14:68, armed robbery in accordance with Article 897.1."

We do find one error in the disposition of this matter that requires a remand for further proceedings. At the disposition hearing, the juvenile judge concluded that the only disposition available in this matter was a secure placement in the custody of DPSC until S.D.'s twenty-first birthday. We find that the juvenile judge erred in this conclusion because, as previously stated, while the disposition imposed for the offense of armed robbery is without benefits, the length of confinement under La.Ch.Code art. 897.1(B) is subject to the discretion of the juvenile judge.

We vacate that portion of the judgment of disposition ordering that S.D. remain in the custody of DPSC until his twenty-first birthday, and remand the matter to the juvenile court for a new judgment of disposition on that aspect of the disposition only, within the discretion of the juvenile judge provided in

20

La.Ch.Code art. 897.1(B). We further instruct the juvenile judge to "orally inform [S.D.] and [] state for the record the considerations taken into account and the factual basis therefor in imposing the particular disposition chosen." La.Ch.Code 903(A)(1). However, nothing in the remand should be construed that this court is instructing the juvenile judge to impose any particular term of disposition, including anything less than confinement to S.D.'s twenty-first birthday.

## DISPOSITION

For the foregoing reasons, we vacate that portion of the judgment of disposition ordering S.D. to remain in the custody of the Department of Public Safety and Corrections until his twenty-first birthday, and remand the matter to the juvenile court with instructions to impose a new judgment of disposition on this aspect only; to amend the court minutes of the disposition hearing to correspond to the disposition reflected in the hearing transcript; and to inform S. D. of the provisions of La.Code Crim.P. art. 930.8 by sending the appropriate written notice to him within ten days of the rendition of this opinion and to file written proof in the record that S.D. received the notice. We affirm S.D.'s adjudication as a juvenile delinquent as well as the remainder of the judgment of disposition.

**ADJUDICATION AFFIRMED; JUDGMENT OF DISPOSITION VACATED IN PART; AND REMANDED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2—16.3.

21